**UNITED STATES of America**

v.

**John J. TAURO, Jr.**

**Crim. No. 72–303.**

United States District Court,
W. D. Pennsylvania.

Aug. 21, 1973.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Wendell G. Freeland, Pittsburgh, Pa., for defendant.

## OPINION

KNOX, District Judge.

Defendant, John J. Tauro, Jr., was indicted on six counts, one (18 U.S.C. § 2315) for receiving stolen securities of a value of $5,000 or more, to wit: five Continental Airlines, Inc. share certificates moving as part of interstate commerce between Denver, Colorado and Pittsburgh, Pennsylvania, and on the five remaining counts (18 U.S.C. § 2314) for causing to be transported the said share certificates in interstate commerce from Pittsburgh to New York City, New York.

Defendant's counsel thereupon filed a motion for new trial on the usual grounds that the defendant should have been acquitted, that the verdict was contrary to the weight of the evidence, that the court erred in refusing to charge the jury as requested and reserving the right to file additional reasons within ten days of the receipt of the transcript of the testimony. No such additional reasons were ever filed aside from the material submitted by the defendant himself. The motion also claimed that the court erred in admitting the opinion evidence of the witness Arthur Nehrbass who testified as to the value of blank stock certificates and also that the court erred in charging the jury as to the applicability of 18 U.S.C. § 2.

Trial in the case was originally set for March 9, 1973, but immediately before the date fixed, defendant discharged one attorney and secured another (his third) who asked for a continuance. While technically the change of attorneys was properly not grounds for continuance, the court nevertheless in its discretion granted the same to the new attorney so that he could prepare the case and the trial was continued to April 9, 1973, when it commenced. The motion for new trial was originally fixed for argument on Thursday, May 17, 1973, however, at the request of defendant and his

counsel (defendant personally signed the request) the argument was continued to June 25, 1973, at which time no one appeared. For fear that some failure of notice existed, argument was continued again to June 27, 1973, at which time defendant and his counsel appeared and each were permitted to argue separately with respect to the motion for new trial.

Further problems began to appear with respect to this case shortly after the verdict when the court began to receive communications from defendant's parents, from defendant himself and from others claiming that there had been a miscarriage of justice, that defense counsel did not adequately represent the defendant at the time of trial, that there was a conspiracy between defense counsel and the United States Attorney's Office and that defendant was being persecuted by military and governmental authorities.

The court has been most liberal in permitting defendant to present his own arguments and to present material in support of his post-trial motion. The defendant has now submitted an affidavit in support of the motion for new trial and a large mass of irrelevant material with respect to his participation in the Forum, an organization in Pittsburgh, and charges of desertion formerly pending against him before the military authorities.

No briefs have been submitted on either side of this case except for the material submitted by the defendant himself. The court will therefore deal with the questions as best it can from the motion as submitted, the arguments made by counsel and the other matters presented by the defendant.

The evidence in this case indicates that on June 16, 1972, a person, later identified as the defendant Tauro, appeared at the Pittsburgh offices of Merrill, Lynch, Pierce, Fenner and Smith, brokers, being a branch of a national brokerage house with main offices in New York City and presented five share certificates totalling 14,000 shares of Continental Airlines, Inc., a corporation listed on the New York Stock Exchange. There were three certificates for 3,000 shares each and two for 2,500 each. On this particular day, the stock was quoted at 21⅜ on the New York Stock Exchange making a value in excess of $280,000. The certificates were, made out in the name of Metropolitan Realty Associates which had no tax identification number. Apparently Mr. Michael, the resident manager who testified in the case, was somewhat suspicious. It was proposed that the certificates be sent in for transfer. The jury could also determine that the certificates were left there for sale, after transfer to street name had been completed. (See N.T. 23) Stock powers separate from the certificates were given defendant to have executed. These were later returned signed by Tauro and one Battiste who testified it was not his signature.

Several days later, it was discovered that the certificates had been stolen in blank from the United Bank of Denver, Colorado, the transfer agent. Officials and clerks of the transfer agent appeared at the trial and testified that the certificates had last been seen there in a cabinet which was kept locked on June 2, 1972. The signatures of various officials had been forged by the time they were presented to the broker in Pittsburgh two weeks later.

The defendant's partner in Metropolitan Realty Associates one Thomas Battiste, testified under a grant of immunity that the certificates had been received from a man named Anthony Todora who offered to pay them a fee of ten percent to negotiate the sale of the certificates. Battiste testified that he was suspicious and withdrew from the transaction. He testified that his signature on the transfers from Metropolitan Realty Associates had been forged. He, however, had driven the defendant Tauro to Merrill, Lynch's Office with the certificates. Agents of the Federal Bureau of Investigation from Washington, D. C. testified that the defendant's fingerprints were found on the certificates. The defendant, when confronted by the

FBI Agents with the circumstances surrounding these certificates, gave certain explanations which upon investigation were found to be untrue. There were thus ample facts in the case to justify the jury finding that the defendant had received the certificates with guilty knowledge that they were recently stolen and that they had been left with the brokerage house for forwarding to New York City for sale and to Denver, Colorado, for transfer. After the certificates had been found to be stolen, they were forwarded to New York City.

■ It is the contention of the defendant's counsel that there was insufficient evidence in the case to justify a finding of value in excess of $5,000 as required by 18 U.S.C. § 2315 [1] and there was also insufficient evidence to justify the jury in finding that the defendant had left the securities with the broker for the purpose of sale or transfer which required transportation to New York and Denver and therefore he was not in violation of 18 U.S.C. § 2314. [2] Even if he himself had not transported the certificates in interstate commerce from Pittsburgh, he had caused and participated in such transportation which made him a principal under 18 U.S.C. § 2.

The first contention of defendant's counsel is that there was no competent evidence that the securities were of a value of $5,000 or more as required by 18 U.S.C. § 2315.

On this question, the government offered the testimony of Arthur F. Nehrbass, Supervisor of the Division of Interstate Transportation of Stolen Goods for the Federal Bureau of Investigation. This witness described the market which existed for stolen securities and also described the value of various forms of stolen securities, particularly securities which had been stolen in blank, as here. He said that blank securities such as these were quite valuable (N.T. 174) and were worth fifteen to twenty percent of their face. In this case since they were admittedly of a value of $280,000 or more, he stated that in his opinion the value of these securities was $45,000. (N.T. 182).

■ It is obvious that when stock certificates such as these are stolen in blank, they can be filled in with anyone's name and for any amount of shares which might pass in the market. In the particular case, the certificates were filled in with amounts of 3,000 and 2,500 shares as heretofore indicated in this opinion and the evidence of the expert on the value of such securities was therefore properly considered by the jury in determining whether the securities were worth $5,000 or more.

The defendant argues, however, the securities were worth nothing being mere blank pieces of paper obviously not worth $5,000 when they were stolen from the bank and that the value at the time of theft is what controls. If the expert's opinion is adopted, the certificates would at least have the value of $45,000 according to his opinion. In any event, after having been filled in at the time of receipt and concealment in attempt to pass them, they would obviously have a value of $45,000 being fifteen to twenty percent of the quoted price times the number of shares filled in.

In this connection, the court instructed the jury in accordance with request

1. "Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken; or . . ."

2. "Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any *falsely made, forged, altered,* or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited . . ."

number two submitted by the government that the value of stolen property under 18 U.S.C. § 2315 can be determined by the market value of the property at the time and the place of the theft or by its value at any time during its receipt and concealment. This was in accordance with United States v. Riso, 405 F.2d 134 (7th Cir. 1969) and United States v. Kramer, 289 F.2d 909 (2d Cir. 1961).

■ See also the decision of the District Court for the Eastern District of Pennsylvania in United States v. Weinberg, 345 F.Supp. 824 (E.D.Pa. 1972). The court in that case appears to have vacillated between value at time of receipt and value at time of theft. The Court of Appeals for this Circuit in affirming the particular conviction in question pointed out the vacillation but found it was unnecessary to determine the question (see United States v. Weinberg, 478 F.2d 1351 (3d Cir. 1973) but it is unnecessary to go into this matter further since the evidence in either event sustained a valuation of at least $45,000 if not the full market value of $280,000. Any reasonable method to fix a value on the securities may be employed. United States v. Lester, 282 F. 2d 750 (3d Cir. 1960).

Defendant's counsel next objects to the court reading to the jury the second paragraph of 18 U.S.C. § 2.[3] (N.T. 227). The court told the jury that if they found that the defendant had placed these securities for sale contemplating that they were to be transported for the purpose of sale in interstate commerce, they might find the defendant guilty although he himself did not actually transport them in interstate commerce.

■ Defendant complains that 18 U.S.C. § 2(b) did not apply to this situation, that it covers punishment only and does not cover causing securities to be transported in interstate commerce with an innocent third party as intermediary, in this case the brokerage house. It will be noted this is not a case of aiding or abetting, but causing an act to be done. The same argument, of course, could be advanced with respect to transportation by a common carrier which was entirely innocent where stolen securities were being transported in an airplane or a motor bus having been given to the crew or driver by the culprit. Certainly anyone who causes such transportation by an innocent third party is guilty as a principal. United States v. Levine, 457 F.2d 1186 (10th Cir. 1972) Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). Otherwise, 18 U. S.C. § 2 means nothing. An indictment need not specifically charge a violation of 18 U.S.C. § 2. United States v. Taylor, 464 F.2d 240 (2d Cir. 1972).

■ The court therefore concludes that there was ample testimony from which the jury could find that the securities were left for the purpose of sale and/or transfer. In either case, the facilities of interstate commerce would have to be used, the other elements of 18 U.S.C. § 2314 were present and therefore the defendant was guilty as charged in Counts 2–6, inclusive of the indictment. See United States v. Masters, 456 F.2d 1060 (9 Cir. 1972).

We now turn to the reasons advanced by the defendant himself as opposed to those advanced by his counsel as justifying a new trial.

The defendant was convicted on April 11, 1973. A motion for new trial was duly filed within seven days by his counsel on April 17, 1973. On April 30, 1973, the court received from defendant personally a letter outlining his further objections to the trial and reasons for granting a new trial which the court ordered to be filed as part of the record. Again, after argument on June 27, 1973, at which time the defendant was permitted to argue personally his complaints

---

3. "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

against his counsel and given permission to file further materials within ten days the court received a voluminous set of documents on July 11, 1973, outlining further his complaints against his counsel and giving an account of his background and life indicating that he was of good character.

■ It will be noted that in the original motion for new trial filed by counsel, the defendant reserved the right to file additional reasons within ten days of receipt of the transcript of testimony. Insofar as this reservation was intended to give defendant the right to file additional reasons, the same would be ineffective under Rule 33. See United States v. Mathews, 335 F.Supp. 157 (W.D.Pa. 1971); United States v. Kane, 319 F. Supp. 527 (E.D.Pa.1970) aff'd 433 F.2d 337 (3d Cir. 1970).

In view of the fact, however, that the defendant and his relatives indicated serious dissatisfaction with the conduct of the case by counsel and treating some of the material as perhaps in the nature of newly discovered evidence the court nevertheless has received this material and has considered it in disposing of this motion.

As the court understands defendant's complaints, they are as follows: (1) his counsel did not put him on the stand to testify in his own behalf, (2) no character witnesses or other exculpatory evidence was produced on behalf of the defendant, (3) the defendant desired to offer evidence about a court martial proceeding in which he had been involved in a trial for desertion before the military authorities of which charge he was acquitted, and (4) he complains that there is a conspiracy between the United States Attorney and his defense counsel to ruin him.

With respect to the complaints as to conduct of the trial by defense counsel, it will be noted that this defense counsel is the third whom defendant has engaged to represent him in this case. The first two counsel were serially discharged by the defendant and the court

in exercise of its discretion gave the third counsel an additional four weeks to prepare for trial when he was engaged by defendant on the eve of trial. Defendant is apparently now not satisfied with the efforts of his third counsel who is known to the court as one of the leading trial and criminal defense lawyers in Allegheny County, Pennsylvania. His conduct of the trial from the court's observation was perfectly competent and he very properly raised all points which could be raised under the circumstances.

■ As to the failure of defense counsel to put defendant on the stand or to call character witnesses, this clearly was a matter of trial tactics for determination by defense counsel who consulted with defendant as to these procedures. It has been recently well said by the Court of Appeals for the Ninth Circuit in Mengarelli v. United States Marshal for Nevada, 476 F.2d 617 (9th Cir. 1973):

"It is trial counsel for the defendant who is best able to appraise the jury; to gauge the effect upon them of failure of defendant to take the stand or present evidence in defense and to judge how best to proceed under the circumstances. Failure to request that the charge not be given, or to object to its reiteration, can only be construed by us as trial strategy.

"Second, appellant contends that he did not receive adequate representation by counsel.

"The court below in this proceeding reviewed the competency of appellant's attorney, as disclosed by the trial record, and concluded that a competent and professional job had been done. Our review of the record provides no basis for disagreement with this conclusion."

See also Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) and United States ex rel. McCloud v. Rundle, 402 F.2d 853 (3d Cir. 1968).

In Henry the court said:

"The evidence suggests reasons for a strategic move . . . . If either

reason motivated the action of petitioner's counsel, and their plans backfired, counsel's deliberate choice of strategy would amount to a waiver binding on petitioner and would preclude him from a decision on the merits of his federal claim either in the state courts or here. . . ."

 Defendant's third complaint is about failure to introduce evidence of proceedings before the court martial which acquitted him of a charge of desertion. This was clearly irrelevant and if offered would not have been admitted any more than if defendant had been convicted before the court martial, we would have permitted evidence of such conviction to be introduced unless defendant took the stand or put his character in issue.

As to the fourth charge of conspiracy between governmental authorities and particularly between the attorney for the defendant and the United States Attorney's Office, the court told defendant that this was a very serious charge to make and the court expected some tangible evidence of such conspiracy. None has been received to date and all we have are conclusory allegations as to this.

At the time of argument, the court told defendant that we did not run two sets of trials, one wherein the defendant could elect not to take the stand and elect not to offer character evidence and then after being convicted and having intelligently made a choice with respect to this method of proceeding, offering a second trial wherein he did take the stand and offer such evidence for the purpose of seeing whether the second verdict would be any different from the first. Certainly, it is a matter for the judgment of defense counsel as to whether the defendant runs a greater risk of exposing matters upon taking the stand or offering character evidence which might in the end ruin his case.

We do not find that any of the materials presented by the defendant amount to after discovered evidence which was not available to the defendant at the time of the original trial. All of these facts were within his personal knowledge at the time and therefore cannot form a basis for grant of a new trial.

For the above reasons, the court sees no reason to disturb the verdict of guilty on all counts as returned by the jury in this case.